## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **EARNESTINE SANDERS** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:12-CV-00377-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 10, 2008, the claimant, Earnestine Sanders, applied for social security insurance benefits under Title II of the Social Security Act, a period of disability under Title XVIII of the Social Security Act, and supplemental security income under Title XVI of the Social Security Act. The claimant alleges disability commencing on January 4, 2008 because of depression, anxiety disorder, borderline personality disorder, and asthma. (R. 109). The Commissioner denied the claim both initially and on reconsideration. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on May 13, 2010. In a decision dated May 27, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for benefits. (R. 22). On December 7, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issues for review: 1) whether the ALJ fully and fairly developed the record regarding the 2009-2010 medical records from Indian Rivers Mental Health Center and regarding the claimant's Global Assessment Functioning Score (GAF); and 2) whether the ALJ properly applied the Eleventh Circuit's pain standard in discrediting the claimant's subjective testimony of her psychotic symptoms.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period of not less than 12
> months....

To make this determination the Commissioner employs a five-step, sequential evaluation

process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The ALJ has a basic obligation to develop a full and fair record. This ensures that the ALJ

has fulfilled her duty to scrupulously and conscientiously probe into, inquire of, and explore for

all the relevant facts. *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). The ALJ is required to

develop the medical history for the 12 months prior to the date of the application for

supplemental social security income. *Ellison v. Barnhart*, 355 F.3d. 1272, 1276 (11th Cir. 2003).

The Global Assessment Functioning Score (GAF) is a subjective determination that

represents the clinician's judgment of the individual's overall level of functioning. *Wesley v.

Comm'r of Soc. Sec.,* No. 99-1226, 2000 WL191664, at *3 (6th Cir. 2000)). Failure to reference

a GAF score is not, standing alone, sufficient ground to reverse a disability determination.

*Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002).  An assessment of a GAF

3

score of 50 or below can indicate serious mental impairments in functioning.  *McCloud v.*

*Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citing the American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994). For any

GAF score in the medical record revealing possible serious mental impairments, the ALJ should

determine what weight, if any, to give that particular score.  *Id.*  However, the  GAF scale "'does

not have a direct correlation to the severity requirements in [the] mental disorders listings.'" *Nye*

*v. Commissioner of Social Sec.*, 2013 WL 3869964 (11th Cir. July 26, 2013).  Therefore, the ALJ

is not required to rely on a GAF score in making his ultimate disability determination. *Luterman*

*v.Commissioner*, 518 Fed. Appx. 683, 690 (11th Cir. 2013).

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and either (1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition or (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

If the ALJ decides to discredit the claimant's testimony as to her pain, she must

articulate explicit and adequate reasons for that decision; failure to articulate reasons for

discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v.*

*Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly

articulated credibility finding with supporting substantial evidence in the record. *Foote*, 67 F.3d

at 1562. The ALJ may consider the claimant's daily activities in evaluating and discrediting

complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

4

## V. FACTS

The claimant has a tenth grade education and was twenty-six years old at the time of the administrative hearing. (R. 40). Her past work experience includes employment as a food service cashier. (R. 22). The claimant alleged she was unable to work because she suffers from depression, anxiety disorder, borderline personality disorder, and asthma. (R. 27).

*Mental Limitations*

On September 21, 2008, the claimant sought treatment in the emergency department of DCH hospital following an alleged assault by her boyfriend. Dr. Robert E. Vickers treated the claimant for swelling of the mouth, a displaced tooth, and abrasions on her elbows. The claimant reported that she lost consciousness during the incident. (R. 344-366).

On December 1, 2008, the claimant sought treatment for psychological impairments at Indian Rivers Mental Health Center. On that date, a doctor[1] practicing out of Indian Rivers diagnosed the claimant with major recurrent depression with psychotic features. (R. 375).

During the claimant's December 1, 2008 visit, Mina Price, a licensed clinical social worker and master's level addiction counselor, administered a mental status exam. In the exam report, Ms. Price noted that the claimant was well-groomed and cooperative, experienced paranoid delusions, auditory hallucinations, and demonstrated a depressed mood. She noted, however, that the claimant's thought process was logical and that her affect and behavior were unremarkable. Ms. Price estimated that the claimant had average intelligence but had memory and concentration impairment. She also noted that the claimant was sexually assaulted once by her cousin at the age of seven and sexually assaulted repeatedly by her boyfriend from the ages of

---

[1]The doctor's signature is illegible, but an "M.D." is legible.

23 to 24 (R. 379).

Ms. Price also completed a Daily Living Activities Inventory for the claimant. Ms. Price reported that the claimant accomplished the following activities all of the time: communicate effectively; maintain clean and stable housing; solve problems; get along with family, friends, coworkers, neighbors and peers; avoid alcohol and drug abuse; and care for personal hygiene and grooming. Ms. Price stated that the claimant accomplished the following activities most of the time: manage her health; manage money; work independently; and comply with community norms. Ms. Price stated that the claimant occasionally managed time and coped with her illness. Ms. Price reported that the claimant never utilized a variety of activities to relax and never utilized community resources.  Ms. Price assessed the claimant as having an overall modified global assessment of functioning (mGAF) score of 55.5 that indicates that the claimant had moderate difficulties in social, work, or school functioning; frequent moderately depressed mood; and insomnia. (R.381-382).

Also on December 1, 2008, a clinician at Indian River Mental Health Center created an integrated clinical summary based upon an interview. The clinician reported that the claimant stated that she broke up with her ex-boyfriend after he beat her until she was unconscious and left her youngest child alone in the street. The clinician stated that the claimant began to experience the following symptoms after breaking up with her boyfriend: inability to sleep well; reoccurring nightmares; fear of the dark; fear that her ex-boyfriend would return; fear of allowing her children to sleep alone; and fear of sleeping. (R. 375).

The clinician noted that the claimant reported a history of depression and stated that she used to take Paxil, an antidepressant. The clinician also noted that the claimant reported that she

was sexually abused by her cousin at the age of seven. The clinician assessed the claimant's problems as "long history of depression, fear of sleep, and paranoia." The clinician set a goal for the claimant to "stabilize her signs and symptoms of mental illness and maximize her level of independence." The clinician also recommended medication treatment and individual therapy and referred the claimant to Turning Point, an organization dedicated to providing resources to victims of domestic violence and sexual assault. (R. 375-376).

On December 19, 2008, the claimant failed to show for an appointment she had with a therapist at the Indian Rivers Mental Health Center and did not reschedule. (R. 378).

On December 24, 2008, the claimant saw Dr. Kazi Ahmad, a psychiatrist at Indian Rivers Mental Health Centers, for a psychiatric consultation. Dr. Ahmad noted that the claimant was experiencing hallucinations, delusions, paranoia, agitation, hostility, hopelessness, and sadness. He noted that the claimant denied alcohol and drug use. He prescribed the patient 30 milligrams of Remeron, an antidepressant, and 2 milligrams of Abilify, a drug used to treat schizophrenia, bipolar, and depression. (R. 389).

On January 23, 2009, the claimant visited Indian Rivers Mental Health Center for a follow-up regarding her medication. Dr. Ahmed stated that the claimant continued having difficulty sleeping and continued to hear voices. He also noted that the claimant felt that people were following her and talking about her. Dr. Ahmad increased the claimant's Abilify dosage from 2 to 5 milligrams to treat the claimant's psychosis and added a prescription for 5 milligrams of Trazodone, a drug used to treat sleeping disorders. (R. 389).

On March 20, 2009, the claimant visited Angela Rosemanno, a Licensed Clinical Social Worker, at the Indian Rivers Mental Health Facility, for a follow-up.  Ms. Rosemanno assessed

that the claimant made minimal progress on her goal to "stabilize her signs and symptoms of mental illness and maximize her level of independence." Ms. Rosemanno also noted that the claimant had no upcoming therapy appointments. (R. 378).

Dr. Ahmad also saw the claimant on March 20, 2009. Dr. Ahmad noted that the claimant experienced hallucinations, delusions, paranoia, and sadness, but that she did not experience agitation or hostility and that she did not feel hopeless. He noted that the drugs seemed to be having some positive effect. (R. 384). Dr. Ahmad stated that the claimant reported that her sleep was much improved but that she continued to hear voices and felt hopeless at times. Dr. Ahmad increased the claimant's Abilify prescription by 5 milligrams and continued to prescribe Trazodone and Rimeron in the same doses. (R. 390).

On June 3, 2009, the claimant again saw Ms. Rosemanno at the Indian Rivers Mental Health Center for a follow-up. Ms. Rosemanno assessed that the claimant made no progress on her goal to "stabilize her signs and symptoms of mental illness and maximize her level of independence." Ms. Rosemanno noted that symptoms of the claimant's mental illness persisted. (R. 378).

On August 26, 2009, the claimant sought treatment with a psychiatrist at the Indian Rivers Mental Health Center to adjust her medication during pregnancy. The claimant requested that she remain on her medication but that the dosage be reduced. The psychiatrist indicated that the claimant did not want to go off her medicine because it helped her. The psychiatrist also indicated that the claimant complained that she still experienced auditory hallucinations. (R. 407).

On June 19, 2009, the claimant cancelled a medication monitoring appointment at the

Indian Rivers Mental Health Center. (R.408).

On November 25, 2009, the claimant saw Nurse Edith Mott at Indian Rivers Mental Health Center for a follow-up concerning her medication. During her visit, the claimant reported that her medication successfully managed all of her symptoms with no side effects. (R. 490).

On January 12, 2010, the claimant saw Dr. Jerry Gragg, a psychiatrist, at the request of the Disability Determination Service. In the evaluation, the claimant told Dr. Gragg that her employment history consisted solely of one job as a cashier at Milo's hamburgers that lasted seven years. The claimant told Dr. Gragg that she left the job in 2007 because the work aggravated her asthma condition. Dr. Gragg reported that the claimant denied any significant history of alcohol use, but stated that she drank heavily at home occasionally because she was afraid. (R. 410).

The claimant told Dr. Gragg that she had been diagnosed with depression in the past and that the doctors at Indian Rivers Mental Health Center prescribed her medication that had helped to relieve her symptoms. Dr. Gragg noted that documentation from Indian Rivers from December of 2008 indicated a diagnosis of "Major Depression Dissorder, Recurrent, with Psychotic Features." Dr. Gragg stated that the claimant's doctors at Indian Rivers decreased her medication in response to her pregnancy and that the reduction caused an increase in her depression. Dr. Gragg noted that records from Indian River indicated that the claimant showed symptoms of paranoia. Dr. Gragg disagreed with this diagnosis, however, since the claimant actually had reason to be afraid. He explained that the claimant's symptoms of paranoia consisted of the claimant's fears of her boyfriend. He stated that because the claimant's boyfriend was frequently physically abusive and because he threatened to kill her in the weeks leading up to her symptoms,

9

her fears were grounded in reality and not paranoia. (R. 410).

Dr. Gragg also completed a consultative examination report on January 12, 2010. Dr. Gragg discussed the claimant's medical history. He noted that at the time of the evaluation, the claimant was under-medicated as a result of her pregnancy. (R. 410). On the functional limitations questionnaire, Dr. Gragg stated that the claimant was not limited in the ability to understand and remember simple instructions; in the ability to make judgements on simple work-related decisions; or in the ability to carry out complex instructions. Dr. Gragg stated that the claimant was mildly limited in her ability to carry out simple instructions and in her ability to make judgements on complex, work-related tasks. Dr. Gragg indicated that the claimant's impairment did not affect her ability to interact appropriately with supervisors, coworkers, and the public. Dr. Gragg noted that the claimant's impairment did not affect any of her other capabilities. (R. 410-412).

Dr. Gragg also interviewed the claimant as part of the psychological evaluation to assess her mental status. Dr. Gragg noted that the claimant was poised and adequately groomed. He stated that the claimant had sufficient reasoning skills, memory, and attention span to carry on a conversation and that her responses and mannerisms were normal. Dr. Gragg estimated the claimant's intelligence to lie in the borderline range of general intelligence. Dr. Gragg stated that the claimant reported experiencing auditory hallucinations and perceptual anomalies in the other four senses. He explained that the claimant's descriptions of her auditory hallucinations were conceivable, but that her reports of perceptual anomalies in the other four sensory modalities were questionable as such symptoms would be extremely rare even in individuals far more psychotic than the claimant.

10

Dr. Gragg stated that the claimant reported difficulties sleeping. He attributed these difficulties to the threats the claimant's boyfriend made against her. He stated that the claimant defined her mood as "not good," but denied having any aggressive behaviors towards others. Dr. Gragg observed that the claimant did appear to be depressed and described her affect as being flat to blunted. Dr. Gragg also observed that the claimant demonstrated indications of Borderline Personality Disorder, including fears of abandonment, unwarranted jealousy, and a history of binge drinking. (R. 413- 415).

Dr. Gragg administered the Weschler Adult Intelligence Scale-IV, an IQ test. The claimant received a Full-Scale IQ score of 55, indicating moderate mental retardation. Dr. Gragg stated that the test was not an accurate reflection of the claimant's true intellectual functioning and noted that he reported her score, only to be in compliance with DDS guidelines. Dr. Gragg described the claimant's effort to participate as "questionable" and stated that the claimant did not seem to be invested in the quality of her test. He also noted that the claimant squirmed in discomfort during the testing. He presumed that her discomfort resulted from her pregnancy. Dr. Gragg stated that the claimant's performance on the IQ test also was inconsistent with her past performance. He explained that he did not believe an individual with an IQ score of 55 could hold a fast-food cashier job for seven years. (R. 415).

In his diagnosis, Dr. Gragg stated: "it does not appear that Ms. Sanders is now or has ever suffered from formal thought disorder, major affective disorder or significant anxiety disorder." He noted that the claimant did, however, have indications of affective disorder and borderline personality disorder features. Dr. Gragg also diagnosed the claimant as having Major Depressive Disorder, in Partial Remission and General Anxiety Disorder, secondary to interpersonal hostility

on the part of the significant other. Dr. Gragg assessed the client as being capable of living on her own and performing household chores but noted that she required some assistance because she was far along in her pregnancy. (R. 415-16).

Dr. Gragg noted that at the time of her evaluation, the claimant was taking a reduced dosage of her medication in response to her pregnancy. Dr. Gragg stated that the claimant told him that the decrease in her medication increased her depressive mood and that her prescribing physician would increase the dose of the medication after the birth of her child. Dr. Gragg recommended that the claimant be reassessed regarding her employment limitations two to three months after the readjustment of her medicine, but he concluded that even with her decreased medication, he did not believe that she suffered from any psychiatric or psychological features that significantly impeded her ability to work. Dr. Gragg also concluded that the claimant's fears and reactions to her boyfriend's abuse were reasonable and did not appear to be related to a psychological condition. Dr. Gragg stated that after the reinstatement of the claimant's higher dosage of medicine, she would be able to return to the job that she previously held or similar jobs and that her condition would not interfere with her ability to follow instructions or get along with others. (R. 416-417)

On February 11, 2010, the claimant saw Rachel Allgood, a licensed professional counselor at Indian Rivers Mental Health Center to discuss her progress. Ms. Allgood continued the claimant's treatment for her mental illness. (R. 485).

On March 23, 2010, the claimant saw clinical therapist Kathleen Bright at Indian Rivers Mental Health Center to seek counseling for the first time and to complete a goals and treatment plan. Ms. Bright assessed the claimant's strengths as ability to cooperate, interpersonal skills and

judgement, lack of substance abuse history, and resiliency. Ms. Bright identified her weaknesses as hopelessness, low self-esteem, lack of resourcefulness, lack of persistence, and lack of vocational goals. Ms. Bright compiled a list of therapy goals to improve the claimant's symptoms and scheduled a follow-up visit for the claimant. (472-474).

During the claimant's appointment with Ms. Bright, the claimant completed a psychological assessment. In this assessment, she reported that her mother allegedly killed her father when she was a young child and that her aunt took her in following the murder. She stated that her depression increased following her aunt's death in 2001. The claimant complained that she never processed her family's deaths and that this caused her sometimes to physically or verbally erupt. She stated that she had visual hallucinations of "shadow people" and that she heard male and female voices who sometimes told her to harm herself. She reported that the "shadow people" often appeared violently in her dreams. The claimant complained that she lost over 20 pounds in the month preceding her appointment. She stated that her symptoms were worsening and that she felt sad and angry. The claimant reported that sometimes she wanted to "take it out" on her children but that she would punch a wall instead. She also reported increased loneliness and a sense of being overwhelmed. (R. 476).

Ms. Bright assessed the claimant as being in an acute phase of chronic mental illness. Ms. Bright noted that the claimant described being depressed most of her life. The claimant told Ms. Bright that she began taking Paxil, an antidepressant, at the age of seven. Ms. Bright reported that the claimant stated that she experienced paranoia, long-term sadness, anhedonia, low motivation, and low self-esteem. The claimant also complained that because of her auditory and visual hallucinations she was unable to sleep at night. The claimant reported that she thought her

symptoms were beginning to worsen. The claimant told Ms. Bright that she wished to pursue her GED, but would only do so if she was denied Social Security benefits. The claimant also stated that she had a limited work history, but could not remember where she worked in the past. (R. 477).

*The ALJ Hearing*

After the commissioner denied the claimant's request for a period of disability, disability insurance benefits and supplemental security income on May 9, 2008, the claimant requested and received a hearing before an ALJ on May 13, 2010. (R. 41).

At the hearing, the claimant testified that she was 26 years old, completed the tenth grade, did not take remedial classes, and did not have a GED or any vocational training. (R. 41). She testified that she had not been employed since the alleged onset of her disability on January 4, 2008.

The claimant stated that she lived with her three children. She noted that her children were ages seven, two, and four months. (R.44). The claimant stated that she last worked for Valley Hill as a cafeteria worker at Bryce Hospital. She stated that her employment lasted for five months and that she stopped working for Valley Hill because she did not cooperate with the employees or the patients. The claimant elaborated that "she got agitated very bad" and did not like when the patients and other employees looked at her or talked to her. The claimant testified that she was not fired from her job at Valley Foods but quit voluntarily. She stated that her experience working for Valley Hill led her to seek treatment from Dr. Ahmad at Indian Rivers Mental Health Center and that at the time of the hearing, she was still seeking treatment there. (R. 41-42).

14

The claimant testified that before she worked for Valley Hill, she worked for Milo's Hamburger Restaurant in Tuscaloosa as a cashier. The claimant stated that during her time at Milo's, she had trouble focusing on her tasks and cooperating with other employees. She stated that she was fired after she "got into it" with an assistant manager. (R.43).

The claimant testified that her boyfriend physically abused her on multiple occasions. She stated that he once dropped her on her head, causing her to lose consciousness and forcing her to seek treatment at a hospital. The claimant stated that upon returning home from the hospital, she began to hallucinate and have panic attacks and became afraid to live in the home and afraid for the safety of her children. The claimant testified that she was taking Remeron, Abilify, and Trazodone as prescribed by her physician. The claimant noted that her medications worked well when she took them. She stated that if she did not take her medications, the depression and hallucinations returned. (R.43-44).

The claimant testified that she had difficulties sleeping. She noted that she took Trazodone to help her sleep. She stated, "When I go to sleep, I feel like I'm having bad dreams about somebody coming to get me or my children, so I don't go to sleep. I just stay up, because I'm so scared to live life." (R.44).

The claimant testified that she took her medicine on a regular basis. She also testified that her mother helped her care for her children by assisting the claimant in bathing the children, feeding the children, and getting the children to school. She stated that her mother also accompanied her to the grocery store to help her select food for her children. The claimant stated that since she did not have transportation, she did not take her children anywhere. (R.46-47).

The claimant described her daily activities, stating "I just sit in the house depressed, and

be pacing around the house, or I try to clean up, but then I find myself saying that I don't love myself, and don't nobody love me."

A vocational expert, Dr. William F. Green, testified concerning the type and availability of jobs that the claimant could perform. Dr. Green testified that the claimant was a younger person with a limited education who had held three food-service cashier jobs in the past. Dr. Green stated that her past jobs had been unskilled and at a light exertional level. (R. 48).

The ALJ asked Dr. Green to assess whether an individual of the claimant's age, education, and work experience with the following limitations could perform the claimant's past work: could perform work at a light level of exertion; must work in a temperature and humidity controlled environment without concentrated exposure to fumes or odors; could understand, remember, and carry out simple instructions; and could perform simple tasks for two hour periods of time. Dr. Green responded that the such an individual could not because the claimant's past work involved concentrated fumes and odors. (R. 48).

The ALJ asked Dr. Green if other jobs existed that the claimant, with the above limitations, could perform. Dr. Green responded that such jobs exist. He stated that the claimant could perform a production job, and over 3,000 jobs at the medium, light, and unskilled levels exist in the state of Alabama and over 300,000 exist nationally. He stated that over 5,000 light, unskilled house-keeping jobs exist in Alabama and that 375,000 exist nationally. Dr. Green also stated that the claimant could perform a light, unskilled ticket-taking job. (R. 48).

The claimant's attorney asked Dr. Green whether the claimant would be able to perform the listed jobs if the ALJ found that the claimant's testimony regarding her social and functional limitations was credible and that the claimant's GAF score was 50. Dr. Green responded that the

claimant would not be able to sustain employment with these limitations.

*The ALJ's Decision*

On May 27, 2010, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability. Next, the ALJ found that the claimant's depression, anxiety disorder, borderline personality disorder, and asthma qualified as severe impairments. She concluded, however, that the right-side pain from which the claimant claimed to suffer did not qualify as severe. She cited the lack of medical diagnosis, the inconsistencies in the claimant's reports of where she experienced pain, and Dr. Singh's accusation of malingering as the reason for her decision. The ALJ found that the claimant's impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R.28-29).

The ALJ also found that the claimant's mental impairments, individually or in combination do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08. The ALJ stated that the claimant's impairments do not meet "paragraph B" that requires that the claimant's impairments result in at least two of the following criteria to be considered a disability: "(1) marked restriction on the activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration."

The ALJ stated that the claimant faced no restriction in activities of daily living. She based this conclusion on the claimant's reports that she cared for her three children, managed her finances, had a driver's license, and spent her days watching television. The ALJ also noted that the claimant's medical records and testimony all indicated that the claimant functioned normally

when she was fully medicated. (R.29).

The ALJ concluded that the clamant had moderate difficulties functioning socially. She noted that the claimant described several occasions when she was discharged from work as a result of having disagreements with her coworkers. The ALJ also noted that the claimant reported experiencing paranoia about interacting with her coworkers and the general public. (R. 29).

The ALJ also found that the claimant to have moderate difficulties regarding concentration, persistence, or pace. The ALJ stated that the claimant indicated that she becomes confused and is unable to stay on task while at work. The ALJ stated that the consultative examining psychiatrist, Dr. Gragg, reported that the claimant had only mild limitations in her ability to understand, remember, and carry out instructions, and to make complex judgements.

The ALJ noted that the claimant requested that her physician reduce her dosage of anti-psychotic and sleep medications during her pregnancy in 2009. The ALJ specified that Dr. Gragg made his assessment during this period when the claimant was undermedicated and that Dr. Gragg determined that the claimant should function normally when she resumed the higher dosage of her medication. (R. 29).

The ALJ stated that no evidence in the record indicated that the claimant had any episodes of decompensation. (R. 30). The ALJ concluded that because the claimant's mental impairments do not cause at least two "marked" limitations, or one "marked" limitation and "repeated" episodes or decompensation of extended episodes, the claimant did not meet the "paragraph B" criteria. (R. 30).

The ALJ also concluded that the "paragraph C" criteria were not satisfied. The ALJ gave the following reasons for her conclusion: the record contained no evidence of repeated episodes

of decompensation; the claimant did not receive a diagnosis of any residual disease process that would cause decompensation with only minimal increases in mental demands; the claimant has no history of requiring a highly supportive living environment; and the claimant did not exhibit an inability to function outside of her home. (R. 30).

The ALJ stated that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: must be in a temperature and humidity controlled environment without concentrated exposure to fumes, odors, or vapors; must only entail concentrating on simple, repetitive tasks for two hour periods in an eight hour workday; must only consist of brief, simple, and non-confrontational interactions with the general public; must provide direct and non-confrontational supervision; and must implement simple changes in the workplace gradually. (R. 30).

The ALJ took into account the undated Function Report that the claimant completed. The ALJ noted that the claimant indicated that she spent most of her day in bed; that she could stand or walk for a minute or less at a time; that she could sit for less than five minutes at a time; and that she required help caring for her children, preparing meals, and grooming herself. The ALJ also noted that the claimant alleged that she suffered from major depressive disorder and could not focus on her work. The ALJ stated that the claimant reported that when she became angry, the symptoms of her asthma increased. The ALJ wrote that the claimant stated that she did not get along well with her coworkers at her last job at Bryce Hospital, and that she experienced paranoia when her coworkers and the hospital's patients interacted with her. The ALJ also took into account that another one of  the claimant's previous employers dismissed her after seven years of employment for failure to get along with her coworkers. (R.31).

The ALJ stated that she recognized that the claimant had a history of domestic abuse and noted that the claimant reported being afraid to return to her house following the most recent incident.  The ALJ stated that the claimant testified that following this incident, her hallucinations, symptoms of sleep disorder, depression, and anxiety began to emerge. (R.31).

After considering the evidence, the ALJ concluded that, while the claimant's medically determinable impairments could reasonable be expected to cause the alleged symptoms, the claimant's symptoms concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the ALJ's functional capacity assessment. (R. 31).

The ALJ next addressed the claimant's subjective testimony of her mental health limitations. She noted that Indian Rivers Mental Health Center treated the claimant for depression, sleep anxiety, and paranoia for several years. The ALJ also noted that on December 24, 2008, the claimant received the diagnosis of major depression with psychotic features. The ALJ stated that the doctors of Indian Rivers Mental Health Center prescribed the claimant Rimaron, Abilify, and Trazodone, that the claimant described as being very effective in controlling her symptoms. The ALJ noted that the claimant requested that her medication dosage be reduced when she became pregnant in 2009. (R. 32).

The ALJ described the claimant's consultative psychological examination with Dr. Jerry Gragg. The ALJ stated that the claimant told Dr. Gragg that she voluntarily left her job at a fast food restaurant because of her asthma. The ALJ also reported that Dr. Gragg assessed that paranoia was likely an incorrect diagnosis for the claimant, in light of the domestic abuse the claimant endured and her reasonable basis for fear. The ALJ stated that Dr. Gragg expressed

doubts concerning the claimant's hallucinations because she stated her hallucinations involved all five senses and such hallucinations are extremely rare. The ALJ stated that Dr. Gragg noted that the claimant did not demonstrate the symptoms that a person with psychosis so extreme as to cause perceptional abnormalities in all five senses would demonstrate. The ALJ noted that the claimant initially stated that she was not a heavy drinker but later disclosed that she went through bouts of binge drinking.

The ALJ reported that Dr. Gragg administered the Wechsler Adult Intelligence Scale-IV test to estimate the claimant's level of intellectual functioning and that the claimant received a full scale IQ score of 55. The ALJ noted, however, that Dr. Gragg was highly skeptical of the results because the claimant did not seem to be exerting effort and would likely not be able to function as a cashier for seven years with an IQ of 55. The ALJ stated that Dr. Gragg indicated that the claimant appeared to be undermedicated secondary to her pregnancy but that she would function normally and be able to return to work when her medicine was corrected post-pregnancy. (R. 32).

The ALJ stated that despite the claimant's reports to the contrary, the notes from the claimant's medical records indicated that the claimant had a history of binge drinking. The ALJ noted, however, that the claimant's drinking did not impose functional limitations. (R. 33).

The ALJ explained that she gave the opinions of Dr. Gragg, a consulting examining physician, and Dr. Singh, a treating physician, substantial weight because their findings were objectively determined and not contradicted by other objective evidence. The ALJ stated that the opinions were based on direct observation and examination and that the findings were both internally consistent and consistent within the context of the medical records as a whole. She also

noted that Dr. Gragg reviewed the claimant's entire medical history. (R. 33).

The ALJ concluded that the claimant alleged a greater degree of debilitation than what objective medical evidence could support. The ALJ noted that the claimant's medical records were inconsistent concerning her educational goals, her physical abilities, and her physical conditions. The ALJ considered that at one point the claimant testified that she left her job at Milos because her manager fired her, but that she told Dr. Gragg that she left voluntarily because the cooking fumes irritated her asthma. The ALJ also considered that in the Clinical Summary Inquiry from Indian Rivers Medical Center, the claimant stated that she wished to obtain her GED but only if she did not receive disability benefits. The ALJ stated that the claimant was inconsistent in the parts of the body in which she reported experiencing pain.  The ALJ interpreted the claimant's inconsistent reports to indicate either that the claimant suffered from short-term, localized ailments or that, as Dr. Singh suggested, the claimant was malingering. The ALJ also noted that while the claimant stated in her Function Report that she could not stand or walk for more than a minute, in her testimony, she stated that she paced around her house all day. (R. 33).

The ALJ determined that, in light of his review of the record, the claimant was capable of performing work consistent with a RFC to perform light work with additional limitations. (R. 34). The ALJ found that, given the RFC to perform light work, the claimant is unable to perform any past relevant work. The ALJ noted that in the past, the claimant held jobs as a cashier, a fast food worker, and as a food preparer, all of which are classified as light and unskilled. However, the ALJ explained that because of the claimant's asthma she needs to work in an area without fumes or odors that could exacerbate her condition and her past jobs did not provide such an

environment. (R. 34).

The ALJ concluded that, considering the claimant's age, education, work experience, and residual functional capacity to perform light work, the claimant could perform jobs that exist in significant numbers in the national economy, such as production jobs, housekeeping jobs, and ticket taker jobs. (R. 35).

The ALJ determined that the claimant had not been under a disability from January 4, 2008 through the date of her decision, and, thus, not entitled to benefits. (R. 35).

## VI. DISCUSSION

**1.** The ALJ fully and fairly developed the record.

The claimant argues that the ALJ failed to develop a full and fair record because she failed to properly take into account the claimant's later medical records from Indian Rivers Mental Health Center and the claimant's GAF score. (R. 6-7). Although the claimant did not specify what information she alleges that the ALJ did not consider, based on the dates of the records, she is most likely referring to the treating notes from Indian Rivers from the period between August 24, 2009 and March 3, 2010 contained in Exhibit 24F. The claimant argues that the ALJ did not properly consider the claimant's medical records from Indian Rivers both because she gave great weight to the testimony of Dr. Gragg, the DDS' consultative examining physician, that predated her later visits to Indian Rivers, and because the ALJ did not include the claimant's most recent treatment notes in her own analysis. This court, however, finds the claimant's allegations to be without basis, as the ALJ did take into account the claimant's most recent treatment notes from Indian Rivers.

The ALJ is obligated to explore all relevant facts pertaining to a case for the sake of

23

developing a full and fair record. *Welch v. Bowen,* 854 F.2d 436, 440 (11th Cir. 1988).  The ALJ must develop the medical record for the period 12 months before the date of the social security hearing. *Ellison v. Barnhart,* 355 F.3d. 1272, 1276 (11th Cir. 2003).

The claimant is correct in her assertion that Dr. Gragg did not look at the claimant's most recent medical records. Because Dr. Gragg's assessment predates several of the treatment dates from Indian Rivers Mental Health Center, he could not have considered these treatment notes. The claimant is incorrect, however, in her argument that Dr. Gragg's failure to consider these records detracts from his opinion or from the completeness of the ALJ's consideration of the record in general.

While the ALJ states that she gave Dr. Gragg's opinion great weight, she does not state that she treated Dr. Gragg's testimony as completely comprehensive, or that she looked to Dr. Gragg's opinion to the exclusion of other information. In fact, the ALJ's opinion indicates the opposite. The ALJ states that she gave great weight to Dr. Gragg's findings because the findings do not contradict other objective evidence in the record. (R. 33). The ALJ's assessment of Dr. Gragg's opinion in the context of the record as a whole indicates that the ALJ did her own analysis of the entire medical record and compared it to Dr. Gragg's opinion.

Further evidence for this conclusion exists in the fact that the ALJ specifically cites information from the part of the record, contained in Exhibit 24F, that the claimant alleges she did not take into consideration.  The ALJ states that she looked at medical notes from Indian Rivers contained in Exhibit 24F that indicated that the claimant's medications were effectively treating her psychotic symptoms. She also found evidence in Exhibit 24F that the claimant's medicine had been reduced in response to her pregnancy. (R. 32). The ALJ also commented that,

in treatment notes from 24F, the claimant stated that she would only attempt to earn her GED if she failed to obtain disability. (R. 33).

In conclusion, because the ALJ looked to the entire record, independently of Dr. Gragg's assessment, including the treatment notes that were created following Dr. Gragg's assessment, this court finds that the ALJ met her obligation to develop a full and fair record and that substantial evidence supports her decision. (R. 33).

Failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination. *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002).  For any GAF score of 50 or below in the medical record revealing possible serious mental impairments, the ALJ should determine what weight, if any, to give that particular score. *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994). However, the ALJ is not required to rely on a GAF score in making his ultimate disability determination. *Luterman v.Commissioner*, 518 Fed. Appx. 683, 690 (11th Cir. 2013).

The claimant correctly asserts that the ALJ did not consider the GAF; however, because the GAF score in this case was above 50 and represents only a moderate limitation in functioning, the ALJ had no duty to assess the GAF score any weight.  Also, the GAF score is neither the most authoritative source on a claimant's level of functionality nor a factor that an ALJ must rely on in reaching a residual functional capacity determination. *See Luterman v. Commissioner*, 518 Fed. Appx. At 690.

The ALJ utilized other accepted factors to make her decision concerning the claimant's functionality apart from the GAF score. She assessed the claimant's impairment based on the

criteria listings of paragraph B of sections 12.04, 12.06, and 12.08, that explicitly measure the claimant's ability to function socially, in daily life, and when focusing on a task. (R. 29). The ALJ took into consideration the claimant's self-reports of the activities she was able to accomplish and Dr. Gragg's evaluations concerning the claimant's limitations. (R. 29-30).

In conclusion, because the ALJ is not required to consider or rely on a GAF score of 55.5, and the ALJ appropriately assessed the claimant's ability to function, this court finds that the ALJ completely and fairly developed the record and committed no reversible error.

## 2. The ALJ properly applied the Eleventh Circuit's pain standard.

The claimant argues that the ALJ improperly applied the Eleventh Circuit's pain standard in assessing the claimant's testimony concerning her psychotic symptoms. The claimant alleges that because the ALJ failed to include the claimant's documented psychotic symptoms, including hallucinations, the ALJ improperly discredited her testimony and statements. (Pl.'s Br. 7).  To the contrary, this court finds that the ALJ properly applied the pain standard and that substantial evidence supports her decision.

The pain standard applies when a claimant attempts to establish disability using her own testimony of subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added).  If the ALJ decides to discredit the claimant's subjective testimony, she must state explicit reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). If the ALJ fails to state explicit reasons for

discrediting the claimant's subjective complaints of pain, the court must accept the testimony as true. *Id*. When evaluating subjective complaints, the ALJ may take the claimant's daily activities into account. *Harwell v. Heckler,* 735 F.2d 1292, 1293 (11th Cir. 1984).

In this case, the ALJ did include the claimant's psychotic symptoms in her decision but after consideration, determined that the claimant's reports regarding those symptoms were not credible. The ALJ conceded that the claimant suffered  from depression, anxiety disorder, and borderline personality; however, she found that the medical evidence failed to support the claimant's allegations that she experienced debilitating paranoia and delusions. (R. 32).

The ALJ dismissed the credibility of the claimant's complaints. She specifically cited Dr. Gragg's opinion in her decision. The ALJ stated that Dr. Gragg expressed doubts concerning the claimant's hallucinations because the claimant stated that her hallucinations involved all five senses and that such symptoms would be rare in even the most psychotic of individuals. The ALJ noted that Dr. Gragg stated that the claimant was not suffering to the same degree as an extremely psychotic individual. (R. 32). The ALJ also dismissed the claimant's delusions. The ALJ noted that Dr. Gragg stated that the claimant's paranoia was not actually paranoia, as it was based in a realistic fear of an abusive boyfriend. (R.32).

Based on the ALJ's reasoning and the factors that she took into account, the ALJ did not ignore the claimant's complaints of psychological symptoms, but rather examined the claimant's testimony in light of the medical evidence and properly dismiss it based on the pain-standard. (R.32).  The court finds that the ALJ properly applied the pain standard and that substantial evidence supports her decision to discredit the claimant's subjective testimony of her symptoms.

**VII. CONCLUSION**

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate Order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 26th day of September, 2013.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE